Johnston, Ch.,
was unavoidably absent at the- argument of the counsel for the appeal, in reply, and therefore declined giving any opinion.
{ty®' The imll of Mrs Ball, might have been desirable for the elucidation of some of the minor points made; but there is no copy or abstract of it in the record of the Appeal court.
The following argument of Col. Hunt, for the appellants, on the main point in this issue, will put the reader in possession of those features, as well of fact as of reasoning, Upon which the appellants relied, more satisfactorily than any attempt of the reporter to digest impartially the encumbered mass of testimony.

*115
Statement of the leading facts.

Mr. and Mrs. Ball where passengers in the Pulaski, on the night of her destruction. At supper, both were seen; Mrs. Ball occupied the ladies cabin. The berth of Mr. Ball was in the gentlemens’ after cabin, immediately below the ladies’ cabin. About 11 o’clock, at night, the explosion occurred. The force of the explosion was forward. It filled the forward cabin with steam, and killed and wounded several persons. It also broke the starboard side of the boat, and blew off the upper deck in the centre, leaving that part of it, over the ladies’ cabin, entire. A rush of air was all that was felt, in the after part of the boat, which tore ofi a few boards from the stairs and a few boards of the cabin floor. But all agree that the occupants of the after cabin, except old Judge Cameron, in all probability, got on deck — no one was proved to have perished, there, merely from the explosion. In a space of time, estimated from twenty-five to forty-five minutes after the explosion, the boat filled in the centre, and, in the act of sinking, carried the fore and after parts under water, and then broke, letting the machinery sink; when the wooden part, that is, the decks, again rose out of water. A few among the passengers got on various fragments of the wreck, and of those, a portion were finally saved. No one of those saved saw Mr. Ball — so that when he perished is absolutely unknown. Mrs. Ball, during the interval between the explosion and the sinking of the decks, was on the main deck, near the door of the ladies’ cabin, and was doubtless drowned when the vessel sunk, as she was too feeble and terror stricken to struggle successfully in the water. Now these facts present the following general positions :
1st. There were three apparent and sufficient causes of death, which overtook Mr. and Mrs. Ball and the rest of the passengers — to wit: the explosion of the boiler — the sinking of the decks, and finally the exhaustion and exposure of such *116 .as escaped the first two, and perished on the rafts and fragr tnents.
2d. There were two apparent and known means by which ,the lives of some of the passengers were prolonged, and a few finally saved — to wit; the boats, and the fragments of the wreck.
3d. The great mass, of those who perished were drowned .when the vessel sunk, inwards and down, until relieved of the weight of the machinery. The explosion destroyed another class — how numerous, is left to conjecture; but they were .those who were on the hurricane deck, midships, or in the for.ward cabin- — there, several are known to have been injured. Not one has leen known to ham leen injured in the after cabin.
The number lost, of those who got on such floats as accident threw in their way, cannot be estimated; but, unhappily, it is too true that several met their death for want of prompt .aid, and those who did escape owe their lives to being picked up by a vessel passing.
Now, the position of the complainant is, “ that Mrs. Ball did not die until after her husband was dead,” and this they undertake to prove, so as to acquire an estate by establishing that fact — and as the establishment of their case requires that, they should prove when Mr. Ball died, in order to get at the conclusion that his wife survived him, let us consider the leading rules. It is for the actors to prove what they allege, by competent legal testimony. “ The party who alleges the affirmative of any proposition shall prove it,” — Gilbert’s Law of Evidence, p. 148.
The fact that Mr; Ball was dead, at the time his wife was heard on the deck, must then be proved. The case of Wilson vs. Hodges, (2 East, 312,) establishes the position that when a person is proved to be alive, he will be presumed to be so until his death is proved — and absence for seven years is the least period known to the law, sufficient to lead to the *117 conclusion, that a person, not heard of, is dead — that being a life, in the estimation of law. It follows, from this brief outline, that the death of Mr. Ball must be proved, like any other fact, by competent evidence' — this evidence must be either direct, or circumstantial. It is admitted there is no direct evidence. Resort must then be had to circumstantial evidence, as -understood by the common law — and not to those artificial, and of course, arbitrary rules, which, in the absence of all proof, are resorted to by positive enactment. What, then, is sufficient circumstantial evidence, to prove the death of Mr, Ball, at a period, anterior to the one when his wife was heard .to call on him? Certainly it must be such as leaves no other conclusion — if it merely prove he might have been dead, it •fails to prove the fact, and only establishes the possibility. To amount to proof, -“there must be a necessary and usual connection between the facts and circumstances, and the conclusion sought. Testing the evidence by these rules, let us examine the facts.
The only cause of death, to which Mr. Ball was exposed prior to the time his wife was known to have been drowned, ,was the explosion — and the whole evidence concurs that not .one of the passengers, in the after cabin, was known to be killed by that, but that, from fifty to sixty actually assembled on the decks, after that event. There is, then, no proof that Mr. Ball was killed by the explosion. The inmates of his cabin are known, generally, to have escaped — not one is known to have perished — nay, not even to have been injured. Mr. Lamar, who occupied the captain’s office, opposite the door of the ladies’ cabin, was not even waked by it. Here, then, there is still, a total absence of any fact, even to excite a surmise that Mr. Ball was an exception to the general result. The next and only cause of death was the sinking of the whole mass. And to this, Mrs. Ball was certainly exposed, with no hope of escape. Admit that Mr. Ball was exposed to the same ca *118 tastrophe, he could escape — he might have escaped. Another passenger, who had lashed his wife to a coop, did, after the vessel sank, rise near, a hatch, on which he reached the promenade deck, and was a witness in this case. So far, then, from it, being proved, that Mr. Ball was dead, before the decks sank, there is no cause of death to which he was exposed— and the great and fundamental error, in the reasoning on the other side, is the resort to negative testimony, which, proverbially, “proves nothing.” He was not seen — he was not heard— therefore, he was dead — although no cause of death is traced to him.
As relates to the merits. — The case made is this: By his will, H. S. Ball gave to his wife his household furniture, servants, &c. and in case he died without children, he gave her all the property received by him in marriage, and other legacies out of his own estate. The claimants allege, that Mrs. Ball survived her husband : that all the provisions made for her, vested, if but for the few awful moments which transpired after the explosion of the boilers of the Pulaski; and that, consequently, her legal representatives are entitled to the same. To place the equity, or justice of the case in a clear point of view, it is only necessary to say, that Mr. Ball never contemplated a legacy, or provision for such a transient and unprofitable end; and, if the survivorship be established, it will be a clear violation of the intention of the testator, and the complainant will succeed upon a naked rule of law. Had Mr. Ball contemplated the death of his wife, within thirty minutes of his own, he would not have provided for her as he did. It was with a view to her prolonged existence and comfort that he made the liberal provisions, now claimed by her representatives, which were intended only for herself. There is, then, no reason to regret the result, if the decision should be, that the parties are decided to have perished together, and the estate should be disposed of accordingly. It is not one of the least inter *119 esting circumstances, attending this thrilling tragedy, that on the 2d of April, 1836, Mr. Ball attached, to his will, a codicil, which’ not being executed in due form of law, is inoperative, by which he actually anticipated the fate that befel him and his wife: — it is in these words, “should any accident occur, that my wife, Anna E. Ball, and myself should die at the same period, or it was not certain whether she survived me, and had made no disposal of the property left her in my said will, and should my adopted daughter Emma be alive, and I leave no heir oí hers, then do I bequeath all my wife’s property, mentioned in said will, to Emma Ball, to be paid her when of age, but, if she die3 before reaching the age of twenty-one, leaving no child or children lawfully born, then the property alluded to goes to whoever the law may direct to be entitled to the' property, it would descend to said child or children.” This codicil, however, is only good, “provided my wife should make no disposal of the property she is entitled to. If she survives she has the right to do so, if she neglects to will away her property, this codicil will hold good in the event of her dying intestate” — strange to say, Mr. Ball added that, “ as the above involves no real estate, 1 concluded witnesses unnecessary:: see Grimke’s Law of Executors: H. S. Ball.” Since the publication of that book, the law has been altered, and witnesses were necessary; so that, if the codicil had been in fact executed in presence of witnesses, then the complainant would have had no claim, but the estate would have gone according to law. But if the strict law does carry-over the estate to strangers to Mr. Ball, it will, of course, be acquiesced in. Still those, whose claim rests upon the rigid provisions of the law, have no cause to complain that the law should prevail, when in favor of their opponents. I only quote this codicil to prove that Mr. Ball, himself, intended, if his wife only survived him for a moment, contemplating some disaster from frequent tra-velling by sea, or if she did not dispose of her estate, it should1 *120 go as the law directs, to his own legal representatives. He contemplated the event that he and his wife might, as they did;perish together; and as it also might happen that Emmashould survive them, he provided for her, but that failing, and if his wife did not survive to dispose of her legacy, it should' go as the law provides. In short, if it was “ not certain whether she survived,” he had no other object of his bounty but Emma, and that failing, he was intestate. As it is admitted that this codicil has no legal operation, the question arises, didMrs. Ball survive her husband, so that his bequest to her vested and descended to her legal representatives, or next of kin! or did both perish so nearly together, that no human testimony can establish that one, in fact, survived the other. If so,then the complainants fail. They claim upon the allegation, that Mrs. Ball did survive her husband. This is the allegation of a fact, to be proved by the party claiming the benefit of it; and it necessarily involves the allegation that Mr. Ball, in fact, died first. This renders it necessary, not merely to prove that Mrs. Ball was alive at any given period, but that Mr. Bell wasactually dead, prior to that period; so that the facts to be proved, are the time when Mr. Ball died, and that Mrs. Ball was alive after that time. This positive, substantive fact, like' every other, must be proven, not conjectured. If circumstances render it impossible to say when Mr. Ball was dead, then' the survivorship of Mrs. Ball is simply not proved, and the' complainants fail to establish their position. As to the mode and manner, in which the positive allegation that Mr. Ballwas dead, at any given time, and that his wife was alive after that time, is to be established; the plain good sense, whichheaven has bestowed on all mankind, is as competent to direct us to the conclusion, as the most extensive learning of the’ most erudite professors of the law, provided we exclude tlW arbitrary and often fanciful rules prescribed by the learned doctors of the civil law.
*121 And I claim that, in this State, the rules of evidence prescribed by the common law prevail, and when they conflict with those assumed by the civilians they must preponderate; To enlarge upon this point would involve me in tedious and unnecessary diffusenes.
But the boasted rifle of the Code Napoleon, over which civilians chuckle with so much admiration, so far as it adopts arbitrary rules, is subject to much cavil. The rule laid down is, in substance, that where two persons, who may inherit from each other, perish by one common calamity, and the fact, which died first, cannot be esablished by positive testimony — the next resort is to circumstantial evidence : so far, the rule is consistent with the common law, but the code then prescribes, if neither positive evidence, nor circumstantial evidence, can fix the fact of survi-vorship, certain arbitrary rules, which the stubborn good sense of the common law has not adopted. But, when neither positive, nor circutnstantial evidence can establish the fact, which died first, the natural conclusion, that both perished together, is the only one to which the mind can come with any shew of reason. Indeed, the Chancellor seems to admit that his decree is based upon circumstantial evidence, and, without quoting authorities, I shall assume that as the true ground of the decision. But, in order to understand the argument, it is first necessary to define, clearly, the propositions to be established, or the fact to be' proved. The claimants base their demand upon the fact, that Mrs. Ball survived her husband, which is exactly the same thing as alleging that H. S. Ball died before his wife; so that it becomes absolutely necessary to prove, either by positive, or circumstantial evidence, the precise period of his death, and then, that his wife was subsequently alive; any failure .will be fatal. Í take it, that it is one thing to prove that Mrs.- Ball was living at a particular time, and quite another tó prove' that her husband was then dead. *122 Admitting, then, that the main proposition is to prove the time when Mr. Ball died, I will, after a few words upon the nature of circumstantial evidence, proceed to collate the facts.
The burden of proof is, clearly, on the complainants; uncertainty is to them fatal, and no mistake is greater than to suppose, that proving Mrs. Ball to be alive, at any period after the explosion, shifts the burden to the defendants, unless the very lame and impotent conclusion is insisted upon, that to prove the wife to be living, is prima facie evidence that the husband is dead. In truth, the defendants are passive; the complainants must prove by positive, or circumstantial evidence, not the existence of Mrs. Ball, but the death of her husband; and I will examine the rules of presumption on that point. That there is no positive proof when Mr. Ball died, is admitted. The fact of his death, not her existence must be proved by legal evidence, that is, facts which will establish it so satisfactorily as to amount to legal proof. If this cannot be done, then the survivorship is not proved. It is the error which has run through the reasoning of the complainants, that to prove Mrs. Ball alive, was to prove she survived her husband; when the time of Mr. Ball’s death, alone, can enable them to shew her survivorship. Let us then examine the true principles of circumstantial evidence, and apply them to the facts of this case. The following contains the very pith and marrow of circumstantial evidence. “In consequence of the frequent failure of direct and positive evidence, recourse must be had to presumptions and inferences from facts and circumstances which are known and which serve as indications more or less certain of those which are disputed and contested. It is consequently, a matter of the highest importance, to consider the ground, nature, and force, of such presumptions, and to enquire what facts, either singly, or collectively, are capable of supplying such presumptions as can be safely relied on.”
*123 “ The ground of all presumption is the necessary, or usual connection between facts and circumstances; the knowledge of which connection results from experience and reflection. A presumption may be defined to be an inference, as to the existence of a fact not actually known, arising from its necessary and usual connection with others that are known.”
“The force of presumptions is almost intuitively perceived by all mankind, is recognized by the illiterate, as well as the learned, and acted upon daily, in the most momentous, as well as in the most common and trivial concerns of life. Presumptions could never have been adopted as the means of 'proof before a jury, if their nature and force could not be estimated by men of plain, ordinary sense and discretion.”
These rules are so obvious, that to state them is enough to challenge the asse.nt of every well poised intellect. The fact, then, when did Mr. Ball die 1 can be as well decided by any intelligent citizen, as by the most adroit casuist. It is not necessary to follow the shadowy reasons of acute civilians, collected in libraries, but any traveller, sea captain, or man of experience, can put together the facts, and arrive at the true elusion. It is not necessary, in this case, for us to show that Mr. Ball was alive; it is for the complainants to shew that he was dead, at the point of time when the main deck sunk and precipitated its occupants into the ocean; for the feeble frame and utter terror of the ill-fated lady of Mr. Ball, forbids the supposition, that she could have reached, or even used any means of safety, when once engulphed in the waves of the ocean; when the deck sunk, she too, perished. Here, then, we have positive proof of the exact time when Mrs. Ball died; it was not more than forty or fifty minutes, some say twenty-five minutes, after the boiler exploded. Having thus fixed the period of her death, beyond doubt, unless equally positive testimony is produced as to the period of Mr. Ball’s death, and it is fixed prior to that moment, the usual presumption pre *124 vails, that he was still alive. Many did survive that event, not only a few minutes, but days ; and as Mr. Ball was a good swimmer, he may have caught a fragment of the wreck and survived a long time. As to Mrs. Ball, this was impossible; feeble, terror-stricken, and unused to the water, she, like every •lady not on the promenade deck, must have perished instantly. So far from there being any proof that Mrs. Ball survived her husband, the evidence is fully competent to establish that ■he survived her. They were both well at supper. No cause of death occurred ’till the explosion. The testimony estab-■lishesth at no one in. the after cabin, except Judge Cameron, perished there. Mr. Ball had his berth there. It was near near his wife: he had no motive to go to the forward cabin: no pne was killed by the explosion in his cabin: it follows that no cause of death was brought to bear upon him prior to the sinking of the deck that certainly destroyed Mrs. Ball. It is not certain it destroyed him. Her death, then, being fixed, and not his, the presumption of survivorship is actually in his favour. The Judge, I think, has mistaken the law as to presumption of death. Death is a fact, and must, like all other facts, be proved by testimony. It is true that, for the purpose of convenience and in analogy to some statutory provisions, ,one who is absent from his friends seven years, and not heard ■from, is treated as dead. That is, his wife may marry without being guilty of bigamy; so if he have a life estate, the one .entitled in remainder may take the estate; but, these are only .rules of convenience. See Starkie on Evidence, p. 37. The :man may not be dead, nevertheless. But, that a man, alive at .supper time, is presumed to be dead at 11 o’clock at night, because he is not heard from, is preposterous. If death has overtaken him, it must be proved, not conjectured. “Where a fact is, in its nature, continuous, after its existence has once been .proved, a presumption arises as to its continuance to a subse'quent time,” “ So, where the existence of a particular indivi *125 ■dual has once been shown, it will, within certain limits, be presumed he still lives.” To prove that a man, who was living a few hours before, is dead, the cause of death must be brought home to him.
It is not enough that he has been exposed to danger. Thus, to prove that a man, well in the morning, is dead at night, it is not enough to shew that he has been in battle, where thousands perished; for, if the presumption prevails as to one, so it will as to every other one, and that would presume the whole army dead, contrary to the known fact; but here, unless Mr. Ball was in the forward cabin, of which there is no proof, there is no likelihood of his having been killed by the explosion; all the evidence concurring that no one was known to have suffered, in the after cabin, from that cause. Let us now consider a few of the rules of circumstantial evidence, and then apply them to ascertained facts. It is a species of evidence only resorted to, “ because it is, in its own nature, capable of producing the highest degree of moral certainty in its application.” Again, an able writer thus expresses it; “the force and tendency of circumstantial evidence, to produce conviction and belief depend upon a consideration of the coincidence of circumstances with the fact inferred, that is, with the hypothesis, and the adequacy of such coincidences to exclude every other hypothe-thesis.” Here is the true clue to circumstantial evidence. The facts proved, must tend to one, only, conclusion; otherwise, it amounts only to “it might be so;” not “it is;” or, to use a veiy pithy expression, “the truth of the proposition is attained by negativing and excluding the truth of any other hypothesis.” Apply these rules to the admitted facts. The whole argument in favor of the survivorship, is this: “Mrs. Ball was heard to call, in a language and tone of deep distress, on her husband. He was a humane and brave man, and would, if living, naturally have responded to her call; but *126 ho one of the few, who have survived, saw him, or heard him-, therefore, he was dead at the time.” This is all, absolutely all, yet the fact that none of the few survivors saw him, or heard him, does not prove that he was not there, neither does the fact, if proved, that he was not with his wife, prove that he was dead.* He might have been seeking some means to save her: he might have been looking for his adopted child, as suggested by my colleague, Mr. Memminger. But, in those few moments of terror and anxiety, when each was in dreadful ■extremity, looking for his own safety, it is not strange that he was not noticed. None of the witnesses had any interest in his fate, sufficient to direct their attention. It was dark: the mantle of midnight enveloped them : the lights were generally extinguished: the passengers, with their outer garments off, their heads bound in night handkerchiefs, would not be recognized with quickness and facility.
It is quite likely, too, that Mr. Ball was necessarily absent in looking for the means of escape, and actually returned to his wife, and found her so nervous and excited, as not to cooperate with him. Dr. Whitridge, many years her attending physician,- states that she was easily excited, and liable to hysteria: her nurse and adopted child were not seen, yet they were safe after the explosion, they were not dead. The mere fact, then, that Mrs. Ball continued to call on her husband, which she would naturally have done, to save her, and that, of ¡the lew who survived, none remember to have seen him near her, raises not even a probability that he was dead. His duty led him away from her. Had he lingered by her side, or attempted to soothe her anguish, he would have neglected his higher duty to her and their adopted child, in providing the means of escape; and this leads us to the solitary fact which is in, any way, connected with Mr. Ball after the explosion ; *127 and it is one of those small incidents that so often point' to the very troth. The polar star is among the smallest in the firmament, yet, still it forms the unerring guide of the wanderer on the pathless ocean. It was proved that, very shortly after the explosion, when one of the quarter boats was just lowered, a man came to the side of the vessel, and threw a coat in, saying, “hold on that boat an instant;” the request was not heeded — the boat pushed off to a respectable distance: but this coat was afterwards examined, when the boat reached the beach, and it proved to be a large sized coat, dark collar, and in the pocket, a collar marked “H. S. Ball.” If this was Mr. Ball’s coat, and he threw it into the boat, there is an end to the question. He is proved to have survived the explosion, and Mrs. Ball was exposed to the second cause of death, and there is no pretence for survivorship — and why was it not Mr. Ball’s 1 Why, say the complainants, because somebody might have taken Mr. Ball’s coat by mistake, and thrown it into the boat. It was not Mr. Ball, because it -was possible that another man had his coat. That the coat was his, is all but certain ; it is not, even by the guessing reasoning of the complainants, pretended that Mr. Ball put his collar into another man’s coat, too, by mistake. If it was his coat, he put it in the boat. It is the natural conclusion that a man would take his own coat, because he knew where he put it. It is usual for men to take their own. It is a mistake to suppose otherwise. It is unusual for persons to take what does not belong to them. Then, the act shows a cool, firm man; he was prompt to prepare for escape, but he was a married man, too, else he would have jumped in after his coat; he, evidently, was providing for others, when he said, “ hold on that boat.” All these coincidences point to Mr. Ball, as the man, and not one is inconsistent with it: it is the natural conclusion. Then, shall the mere fact, that all the witnesses are dead, who saw him; that the few survivors did not see him, outweigh the presumption1 *128 that a living man continues to live, until a cause of death ist brought home to him? Also, the facts, that not one was known to be killed in the after cabin, and that his coat was put. into a boat, while he returned to bring his wife, and others under his care ? I, thus imperfectly, I am aware, present to the court, the case of the executors of Mr: Ball; and conclude, that there is no legal proof that Mr. Ball was dead, at the time the witnesses heard the cries oí his wife. That no human testimony can fix the time of his death, while that of his wife, isr rendered almost certain. And thus, so far from the complainants’ having established their survivorship, the weight of evidence proves that the husband survived. It is enough for us,' that the fact is left unsettled. The burden of proof was upon the complainants; and they have failed to establish their position.
An attempt was made to set up an arbitrary rule, “ that the last heard from is deemed to be the survivor,” but nothing can be . more unauthorized. The law no where recognizes any arbitrary rule of the kind, for it depends altogether upon the accidental circumstances — -what witnesses survive to tell the tale? Two men are in battle, both perish, and the time when each or both died is not known, would the mere fact, that one was seen after the first volley, prove that he was the survivor? The error lies in inverting the proposition to prove a survi-vorship. The time of the death of thefirst party is the point to be fixed, and then the subsequent existence of the second, or survivor. Any other rule is arbitrary; but, however applicable such a rule might be, where parties might be missing for years, it has no application to a case where both died in a common catastrophe, and certainly within half an hour of each other. In this case, the rule prevails; that once alive, life is presumed to continue till death is proven; such, is the settled law. The best modern decisions, concur that the only safe rule, is to decide, in the absence of conclusive testimony, *129 that both perished together.- When Heaven has drawn a curtain around the scene, which human vision cannot penetrate, it is presumption to conjecture; and no good comes of such an effort to vest an estate for a few minutes of terror and dismay, and thus divert it from its legal channel. This is not so desirable as to induce us to strain the rules of evidence, and substitute mere conjecture for ascertained truth;

 Negative testimony, leads to no conclusion.